1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DAVIS HERNANDEZ,

11          Petitioner,                    No. CIV S-04-0280 GEB GGH P

12      vs.

13   JOSEPH McGRATH,

14          Respondent.          FINDINGS & RECOMMENDATIONS

15   _____/

16   I.  Introduction

17          Petitioner is a state prisoner represented by counsel, proceeding on an amended

18   petition for writ of habeas corpus.  Petitioner challenges his 2000 conviction for four counts of

19   assault with a semi-automatic firearm (count1, 2, 7 & 8 Cal. Penal Code § 245(b)), shooting at an

20   occupied motor vehicle (count 3, Cal. Penal Code § 246), attempted murder (count 4, Cal. Penal

21   Code § 664 and § 187(a)), shooting a firearm from a motor vehicle (count 5, Cal. Penal Code §

22   12034) and street terrorism (count 6, Cal. Penal Code § 186.22(a).  Petitioner is serving a

23   sentence of life in prison plus a consecutive term of 25 years to life and a determinate

24   consecutive term of 12 years, eight months.

25          Petitioner raises the following claims in his challenge: 1) discovery violations; 2)

26   improper hearsay testimony of a gang expert; 3) preclusion of a dying declaration; 4) severe

1

1  defense discovery sanctions; 5) ineffective assistance of counsel; 6) Brady violations; 7)

2  replacement of a juror without proper instructions; 8) improper jury instructions; 9) prosecution

3  misconduct; 10) improper sentencing.  Amended Petition (AP) at 8-12.

4         After carefully considering the record, the court recommends that the petition be

5  granted in part.

6  II.  Anti-Terrorism and Effective Death Penalty Act (AEDPA)

7         The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

8  petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

9  138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

10  AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

11  standards of review to be used by a federal habeas court in assessing a state court's adjudication

12  of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263

13  (9th Cir. 1997).

14         In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

15  Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

16  for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

17  between "contrary to" clearly established law as enunciated by the Supreme Court, and an

18  "unreasonable application of" that law.  Id. at 495, 117 S. Ct. at 1519.  "Contrary to" clearly

19  established law applies to two situations:  (1) where the state court legal conclusion is opposite

20  that of the Supreme Court on a point of law, or (2) if the state court case is materially

21  indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is

22  opposite.

23         "Unreasonable application" of established law, on the other hand, applies to

24  mixed questions of law and fact, that is, the application of law to fact where there are no factually

25  on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

26  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

2

AEDPA standard of review which directs deference to be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Williams (Terry)</u>, 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  <u>Woodford v. Viscotti</u>, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  <u>Early v. Packer</u>, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is contrary to, or an unreasonable application of, established Supreme Court authority.  <u>Id.</u>  An unreasonable error is one in excess of even a reviewing court's perception that "clear error" has occurred.  <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  <u>Early v. Packer</u>, 537 U.S. at 9, 123 S. Ct. at 366.

However, where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).

\\\\\

\\\\\

III.  <u>Background</u>

    The opinion of the California Court of Appeal contains a factual summary.  After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

    Around 4:00 or 5:00 p.m. on October 12, 1999, a man on a bicycle approached a car stopped at the intersection of Myrtle and E Streets in Stockton.  The bicyclist stared menacingly at the car's passenger, Babaline Lopez.  When the driver of the car, Richie Chavez, turned to look at him, the bicyclist raised three fingers and said, "Sur Trece."  Chavez replied, "It's all about Norteno."  The bicyclist then pulled out a gun and fired at least five shots in the direction of the car, while Chavez drove in reverse.

    The verbal exchange between the bicyclist and Chavez contained references to two Hispanic gangs in Stockton-the Nortenos, who are from Northern California and identify themselves with the number 14, and the Surenos, who are from Southern California and use the number 13.  The Nortenos and the Surenos are bitter rivals who have killed or assaulted opposing gang members numerous times.

    In a photo lineup and at trial, Lopez identified defendant as the bicyclist who shot at Chavez and Lopez.  Chavez denied that defendant was the perpetrator, but testified he saw the bicyclist riding in a pickup truck later on the day of the shooting.  When Chavez was shown a photo lineup prior to trial, he refused to look at it because he did not want to be labeled a "snitch," especially if he ended up in prison.  At the time of trial, Chavez was in prison.

    After escaping from defendant, Chavez dropped Lopez off nearby at his house and went to see his friend, Samuel Vasquez.  Some time later, Lopez saw Chavez drive past the house with Vasquez and other friends in his car.  She also saw a pickup truck drive by with defendant in the passenger seat.  Lopez thought that the occupants of the pickup truck observed Chavez's car and that a chase may have ensued.  About 20 minutes later, while Lopez was returning from a trip to the store, she saw defendant in the passenger seat of a Suburban driven by the same man who had been driving the pickup truck.  One of the men in the Suburban called out to Lopez, "Hey, what's up, girl?"  Subsequently, Lopez saw the same two men again in the pickup truck.  Thereafter, she heard a series of about five gunshots.

    At approximately 7:00 p.m. that evening, Vasquez, his sister, Chonnel, and a friend, Lourdes Vizcarra, were walking to a grocery store at the corner of Washington and E Streets in Stockton, which was about two blocks from where Chavez and Lopez were assaulted two hours earlier.  The pickup truck, in which Lopez had seen defendant riding as a passenger, drove up to the pedestrians, and the passenger called out, "What's up, ese?"  Vasquez replied, "I'm not a[n] ese. I'm a[n] ene."  The question, "what's up, ese?" is a friendly greeting when spoken by one Sureno to another, but when directed at a Norteno, the question can be an insult or challenge.

4

After Vasquez responded, the passenger pulled out a gun and fired several shots at him, one of which struck him in the back.  Vasquez collapsed, but the gunman continued firing while Vasquez rolled around on the ground in an attempt to avoid being hit again.  Vasquez was later taken to the hospital where he was treated for a gunshot wound.

The pickup truck involved in the drive-by shooting had been stolen from a parking lot after 5:00 p.m. but before 6:00 p.m. on the day of the shootings.  On November 1, 1999, Ramiro Montanez, pled guilty to a charge of receiving stolen property with respect to the pickup truck.  When defendant was arrested six days later, he was seated in the front passenger seat of a blue Suburban driven by Montanez.

The stolen pickup truck was recovered on the date of the shootings.  Defendant's right palm print was found on the vertical frame behind the driver's door of the pickup truck, while part of his left palm print and his left thumbprint were on the driver's-side exterior mirror.  Six other fingerprints were lifted from the pickup truck, but they did not match defendant's fingerprints.

The police recovered five bullet casings near the intersection of Myrtle and E Streets, where Chavez and Lopez were fired upon, and found another six casings near the intersection of Washington and E Streets, where Vasquez was shot.  All eleven casings were Winchester .380 caliber shells.  A ballistics expert opined that all six of the cartridges recovered near Washington Street, and at least one of the five cartridges found near Myrtle Street, were fired from the same semiautomatic gun.  The other four cartridges were probably fired from the same gun but the witness could not say so "to a scientific certainty."

Initially, Chonnel did not identify defendant as the gunman in a photo lineup shortly after the shooting.  But she identified him at the preliminary hearing and at trial, and explained that she had recognized him in the photo lineup but did not point him out because she feared retaliation.  She also testified that she had seen defendant on a bicycle earlier on the day of the shooting.

Vizcarra "almost right away" selected defendant from a photo lineup and stated she was "100 percent sure" he was the shooter.  And at the preliminary hearing, she identified defendant as the gunman.  At trial, however, she recanted her prior identifications of defendant.  When asked to scan the courtroom to see whether she recognized the gunman, Vizcarra initially refused to even look at defendant.  After being told that she would not be allowed to leave until she looked at defendant, Vizcarra finally did so. When asked whether he was the person who shot Vasquez, she replied, "Doesn't look like him."  Vizcarra then claimed that "everybody" in court, including the judge, had pressured her into identifying defendant during the preliminary hearing.

Vasquez initially gave police a detailed description of the gunman and stated that he had had run-ins with the gunman on other occasions.  When Vasquez was shown a photo lineup that included a picture of defendant, he told police he recognized the gunman but would not point him out because "[h]e was going to take care of it himself."  In another police interview a few weeks later, Vasquez identified defendant as the man who shot him.  At trial, Vasquez claimed that he

could not recall having provided police details about the gunman or the shooting incident, or having identified defendant.  Vasquez was in prison at the time of trial, and he admitted that it was "bad to be a snitch in prison."

Detective Nicholas Garcia, a gang expert for the Stockton Police Department, testified defendant is a documented member of the Vickystown gang, which is a Sureno gang in Stockton.  Garcia's testimony was supported by another police officer who testified defendant told him in January 1999 that defendant had been a member of the Vickystown gang for eight years.  A San Joaquin County Sheriff's official stated that defendant said he was a member of the Vickystown gang when he was booked into jail.  In addition, defendant has a tattoo of three dots on the fingers on his left hand, another sign of membership in a Sureno gang.

According to Garcia, Chavez and Vasquez are documented members of a Norteno gang, while Montanez, who pled guilty to possessing the stolen pickup truck, is a Vickystown gang member.  Based on the circumstances of the crimes and the fact the male victims and defendant were in rival gangs, Garcia opined that the shootings were gang-related.  He also believed that the shooting of Vasquez was in retaliation for the unsolved murder of a Vickystown gang member, who was nicknamed "Toaster."  Garcia had information from a Vickystown gang member that Vasquez had shot at defendant a few weeks before the present shootings, and that Vasquez told defendant he was going to shoot him "like he killed Toaster."

Garcia testified that gang members will retaliate against someone who has victimized them, but they are reluctant to report the matter to the police or cooperate with a police investigation for fear of being labeled a "snitch."  Being viewed as a "snitch" can result in physical harm.  Garcia also stated that it was common for gang members to attempt to intimidate witnesses testifying in trials involving charges against fellow gang members.

Defense

Defendant presented an alibi defense, claiming that he was at a birthday party at his girlfriend's house most of the evening of October 12, 1999.

Defendant's girlfriend, Claudia Manriquez, testified that defendant arrived at her house with his son at around 9:30 or 10:00 a.m.  He remained there until around 5:00 or 5:30 p.m., when they left to go get a cake for Claudia's sister, Yasenia, who was celebrating her sixteenth birthday.  Claudia recalled the time because they were leaving as her father returned home from work, and he usually arrived home around 5:30 p.m.  After they returned with the cake, defendant left briefly to take his son home around 10:00 p .m., and then came back to the house.

On cross-examination, Claudia stated that, before entering the store to get the cake, defendant walked over and talked to Montanez, who was sitting in a large truck in the store's parking lot.  When asked if she saw defendant touch the truck, she replied she could not remember, but defendant "probably could have leaned on it ... he probably could have touched it."  When Claudia was shown a copy of her employment records showing that she worked on October 12, she insisted the records were wrong.  She claimed to be on a leave of absence during that period of time even though her employment records showed she had worked the day of

6

the shooting and the day before.

Claudia's cousin, Nora Galaviz, testified that she was at the house during Yasenia's birthday party and that she went with Claudia and defendant to get the cake around 5:00 or 6:00 p.m.  Before defendant went into the store, she observed him talking to Montanez in a truck "for a few seconds."

Yasenia Manriquez testified that defendant and Claudia returned with the birthday cake around 5:30 p.m., and defendant was still at the house when Yasenia left around 8:00 or 8:30 p.m.

Yasenia's brother, Victor Manriquez, testified that defendant was at the house at 2:00 p.m. on October 12, when Victor came home during a work break.  Victor admitted having belonged to a Sureno gang, but denied current membership.

Rachel Asuncion, who was Victor's girlfriend at the time, stated that defendant left to get the cake around 5:00 or 5:30 p.m. and was gone for about 20 to 30 minutes.

Defendant testified that he arrived at his girlfriend's house with his son on the morning of October 12, and he went with Claudia and Nora to get a cake for Claudia's sister.  When they arrived at the store, defendant saw Montanez in a pickup truck with some other people, and he stopped to talk to him for about five minutes.  Defendant remembered touching the exterior of the pickup truck around the driver's door.  But he could not recall touching the driver's mirror. When the prosecutor pointed out that defendant's prints were on the mirror in a position indicating that he had been sitting in the driver's seat and adjusted the mirror, defendant stated he may have leaned on the mirror.

Defendant asserted he did not own or have access to a bicycle, and he claimed he never had a fight with Vasquez.  Acknowledging that "Toaster" was a friend of his girlfriend's, defendant admitted going to Toaster's funeral but denied having heard that Vasquez shot Toaster or that Vasquez had threatened to kill defendant. Defendant denied shooting at Chavez, Lopez, Vasquez, Chonnel, or Vizcarra.

California Court of Appeal Opinion (Opinion) at 2-9.  See also 2002 WL 1904408.

IV.  Argument & Analysis

        A.  Claim 1 - Discovery Violation

        Petitioner contends that the prosecution's delay in providing contact information for a witness with potentially exculpatory evidence, who was then unavailable at trial, violated petitioner's Fifth, Sixth and Fourteenth Amendment rights to a fair trial.  Petitioner's State Appellate Brief at 13.

\\\\\\

7

1        *Legal Standard*

2        As is well known, the due process clause of the Fourteenth Amendment to the

3  United States Constitution creates a duty in the prosecution to disclose certain evidence to a

4  defendant.  See United States v. Bagley, 473 U.S. 667, 674-677, 105 S. Ct. 3375, 3379-3381

5  (1985).  The evidence, however, must be both "favorable" to the defendant and " 'material' " to

6  either guilt or penalty.  Id. at 674, 105 S. Ct. at 3379.  Favorable evidence is evidence that the

7  defense could use either to impeach the state's witnesses or to exculpate the accused.  Id. at 676,

8  105 S. Ct. at 3380.  "Bagley held that ... favorable evidence is material, and constitutional error

9  results from its suppression..., 'if there is a reasonable probability that, had the evidence been

10  disclosed to the defense, the result of the proceeding would have been different.' "  Kyles v.

11  Whitley, 514 U.S. 419, 433-434, 115 S. Ct. 1555 (1995).   A "reasonable probability" is one

12  sufficient to "undermine[ ] confidence in the outcome." Bagley,  473 U.S. at 678, 105 S. Ct. at

13  338.

14        Following the shootings, Detective John Reyes interviewed fourteen year-old

15  Edgar H., regarding what he observed.  Edgar stated that he was in a car with family members

16  when he observed victim Richie Chavez standing on the street speaking to someone in another

17  vehicle.  Chavez approached Edgar's car and said that someone had been shooting at him earlier

18  and then Chavez pointed towards a truck and indicated that is whom shot at him.  Reporter's

19  Transcript (RT ) at 634.  Edgar stated that he observed the truck and got a good look at the two

20  people in the truck and could identify them.  RT at 635-636.  Edgar was able to identify the truck

21  and after observing a photo array identified Ramiro Montanez as the driver, but did not pick

22  petitioner's photo from the array.  RT at 635.  Detective Reyes prepared a report with Edgar's

23  statement but did not place Edgar's contact information in the report.  Petitioner's counsel stated

24  that he attempted to get Edgar's contact information starting in December 1999.

25        Detective Reyes attempted to serve Edgar with a subpoena in May 2000 but

26  learned that Edgar and his mother had moved to Mexico.  RT at 81, 93.  While Edgar's mother

8

1    had mentioned  moving to Mexico, she provided no date and did not say a move was certain.  RT

2    at 93-94.  Detective Reyes was unaware they had moved.  Id.  On May 25, 2000, the trial court

3    ordered the prosecution to provide petitioner with Edgar's contact information and the

4    prosecution complied after Detective Reyes learned Edgar's new phone number.  Clerk's

5    Transcript (CT) at 213.  A defense investigator contacted Edgar several times and Edgar stated he

6    would not return to testify.  Id.

7            Petitioner argued to the trial court  that Edgar's testimony was exculpatory and the

8    delay providing Edgar's contact information allowed Edgar to leave the country and prevent him

9    from testifying at trial.  The trial court held that Edgar's statement was not exculpatory and that

10   Detective Reyes withheld the contact information in good faith.[1]  RT at 128.  The court also

11   stated that Detective Reyes did not have specific knowledge that Edgar was moving to Mexico

12   and the move was not caused or assisted by the prosecution.  Id.  The trial court held there was no

13   violation of petitioner's constitutional rights, but the prosecution violated the spirit of the

14   discovery laws.  RT at 131-132.  As a sanction, the trial court allowed Edgar's statements to

15   Detective Reyes to be admitted through the detective's trial testimony.[2]  RT at 133-134.

16           The Court of Appeal upheld the trial court's rulings and found no violation of

17   petitioner's constitutional rights.  Petitioner now seeks habeas relief for alleged violations of his

18   due process rights due to the prosecutions failure to provide the witness' contact information in a

19   timely manner.

20           Petitioner has failed to show the prosecution's failure to provide Edgar's contact

21   information deprived petitioner of favorable or material evidence as outlined in Bagley.

22   Petitioner was provided with Edgar's contact information four months prior to the start of trial

23

24           [1] Detective Reyes testified that Edgar's mother was concerned about gang retaliation and
     he may have kept the contact information secret for the safety of the witness but he could not
     remember.  RT at 91-93.

25

26           [2] Detective Reyes testified at trial that Edgar identified Montanez as the driver but was
     unable to identify the passenger from several photo arrays. RT at 635.

                                                    9

1  and in that time petitioner's investigator contacted and spoke with Edgar on multiple occasions.

2  Yet, petitioner has provided no evidence on how Edgar's testimony would have been any better

3  than his statements that Detective Reyes testified to.  The trial court and Court of Appeal

4  correctly noted that Edgar's testimony was not exculpatory.  Edgar was not present at either of

5  the shootings and could only testify that he did not see the petitioner in the car following the

6  Chavez shooting.[3]

7          Petitioner has also failed to show how knowledge of Edgar's location any earlier

8  would have enabled petitioner to insure Edgar's appearance.  Petitioner maintains that he could

9  have served a subpoena on the witness, yet there is no showing that this would have prevented

10  Edgar's family from moving him to Mexico.  Petitioner merely speculates that Edgar's testimony

11  would have aided his defense.

12          Petitioner's speculation falls short in demonstrating that this testimony would

13  have undermined confidence in the verdict.  Kyles, 514 U.S. 419, 433-434, 115 S. Ct. 1555.  Nor

14  has petitioner shown that the evidence was either favorable or material.  Bagley, at 672, 105 S.

15  Ct. At 3379.  Thus, petitioner's claim should be denied.

16                  B.  Claim 2 - Erroneous Admission of Hearsay Testimony

17          Petitioner correctly contends that his right to confront adverse witnesses under the

18  Sixth Amendment was violated when the trial court admitted testimony from the prosecution's

19  expert that relied on hearsay from a gang member who was unavailable and was not proper

20  expert testimony.  AP at 25.

21                  *Legal Standard*

22          The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal

23  prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against

24  him. . . ."  U.S. Const. Amend. VI.  This right, extended to the States by the Fourteenth

25  _____

26          [3] Edgar was a intended to be a prosecution witness had he been available.

1    Amendment, includes the right to cross-examine witnesses.  Cruz v. New York, 481 U.S. 186,

2    189, 107 S. Ct. 1714, 1717 (1987).  "The central concern of the Confrontation Clause is to ensure

3    the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in

4    the context of an adversary proceeding before the trier of fact."  Lilly v. Virginia, 527 U.S. 116,

5    124, 119 S. Ct. 1887, 1894 (1999).  See also Davis v. Alaska, 415 U.S. 308, 315, 94 S. Ct. 1105,

6    1110 (1974) (a primary interest secured by the Confrontation Clause is the right of cross-

7    examination).  The right to confront witnesses, guaranteed by the Sixth and Fourteenth

8    Amendments, includes the right to cross-examine adverse witnesses to attack their general

9    credibility or show their possible bias or self-interest in testifying.  Olden v. Kentucky, 488 U.S.

10   227, 231, 109 S. Ct. 480, 483 (1988); Delaware v. Van Arsdall, 475 U.S. 673, 678-79, 106 S. Ct.

11   1431, 1435 (1986); Davis, 415 U.S. at 316, 94 S. Ct. at 1110.  "The Confrontation Clause

12   guarantees an opportunity for effective cross-examination, not cross-examination that is effective

13   in whatever way, and to whatever extent, the defense might wish."  VanArdall, 475 U.S. at 679,

14   106 S. Ct. at 1435.

15          At trial, Detective Nicholas Garcia, a gang expert, testified about the violent

16   conflict between the Sureno and Norteno gangs and the motive for petitioner to commit the

17   crime.  RT at 776-777.  He stated there had been several homicides between the two gangs in

18   Stockton and that petitioner was in the Vickystown gang affiliated with the Surenos, while the

19   two victims, Richie Chavez and Samuel Vasquez, were members of the Norteno gang.  Id.

20   Detective Garcia explained that it is common for a Sureno to attack a Norteno, solely due to gang

21   affiliation.  RT at 779-780.  Drive-by shootings using stolen cars are also typical of the violence

22   between these two gangs.  Id.

23          Detective Garcia provided his opinion on why Vasquez was shot.  He stated that

24   he had information from a Vickystown gang member that Vasquez had shot at petitioner a few

25   weeks before and Vasquez had said that he was going to shoot petitioner like Vasquez had killed

26   \\\\\\

11

Toaster.[4]  RT at 786.  Toaster was a nickname for a Vickystown gang member, the same gang as

the petitioner, and had been killed the previous month.  RT at 786-787.  Detective Garcia went

further and said that in his expert opinion, petitioner had shot Vasquez as gang retaliation for

Toaster's murder and for being shot at by Vasquez.  RT at 787.

Detective Garcia obtained this information from a Vickystown gang member,

Ramiro Montanez.[5]  Montanez stated that petitioner had told him about Vasquez killing Toaster

and shooting at him.[6]  RT at 504-505.  Detective Garcia learned this information during an

interrogation of Montanez regarding the instant shooting.  Montanez did not directly implicate

himself or petitioner in the instant shooting.

Petitioner's counsel objected on the grounds that Detective Garcia's expert

testimony was based on hearsay and Montanez' unavailability, by asserting his Fifth Amendment

rights, prevented counsel from conducting a proper cross examination.   The trial court overruled

these objections and allowed Detective Garcia to testify that a gang member provided him with

the information, but precluded him from identifying Montanez as the source or that petitioner had

originally stated the information.[7]  RT at 718-719, 733-744.

Petitioner argues that the trial court's ruling deprived him of his Sixth and

Fourteenth Amendment rights to confrontation and a fair trial.  The Court of Appeal found that

the trial court erred in allowing Detective Garcia to testify about petitioner's personal motive for

---

[4]  Toaster's real name was Juan Martinez.

[5]  Ramiro Montanez was the driver of the pick up truck petitioner rode in immediately
following the shooting and the person petitioner was with on the date of his arrest several weeks
after the shooting.  Montanez  pled guilty to receiving stolen property with respect to the pick up
truck.

[6]  Petitioner testified that he knew of Toaster, but had never been told that Samuel
Vasquez had killed Toaster.  Petitioner also testified that he did not know Samuel Vasquez until
the trial began.  RT at 990-991.

[7]  The trial court ruled that revealing Montanez' identity would be too prejudicial to
petitioner but allowed the prosecution to elicit that Detective Garcia's source was a gang
member.  RT at 738.

shooting Vasquez.  The Court of Appeal did not address the Confrontation Clause claim, instead

finding that the admission of the expert testimony violated the California Evidence Code, stating:

> A person may qualify as an expert witness if the person has "special knowledge, skill, experience, training, or education" in a particular field.  (Evid.Code, § 720.)  An expert witness may give testimony in the form of an opinion, but expert opinion testimony is admissible only if the subject matter of the testimony is "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (Evid.Code, § 801, subd. (a).)  The subject matter of the culture and habits of criminal street gangs meets this criterion.  ( People v. Gardeley (1996) 14 Cal.4th 605, 617, 59 Cal.Rptr.2d 356, 927 P.2d 713.)
>
> Evidence Code section 801, subdivision (b), limits expert opinion testimony to an opinion that is "[b]ased on matter ... perceived by or personally known to the witness or made known to [the witness] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [the expert] testimony relates ...."  Any material that forms the basis of the expert's opinion must be reliable, but so long as this threshold requirement of reliability is satisfied, even matter that is ordinarily inadmissible-such as hearsay-can form the proper basis for an expert's opinion testimony.  ( People v. Gardeley, supra, 14 Cal.4th at p. 618, 59 Cal.Rptr.2d 356, 927 P.2d 713.)  "And because Evidence Code section 802 allows an expert witness to 'state on direct examination the reasons for his opinion and the matter ... upon which it is based,' an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion...."  ( Ibid., citations omitted.)
>
> Thus, the court properly permitted Garcia to testify about the behavior of the Sureno and Norteno gangs in Stockton and to opine that the shootings were gang-related based upon his experience and information he had gathered from other officers and gang members, even if this information was hearsay.  ( People v. Gardeley, supra, 14 Cal.4th at pp. 617-618, 59 Cal.Rptr.2d 356, 927 P.2d 713; People v. Olguin (1994) 31 Cal.App.4th 1355, 1370, 37 Cal.Rptr.2d 596; People v. Gamez (1991) 235 Cal.App.3d 957, 965-966, 286 Cal.Rptr. 894.)
>
> But in admitting Garcia's opinion testimony about defendant's personal motive for shooting Vasquez based on hearsay statements about specific prior incidents, the court erred because this was not the proper subject of expert testimony.  The conclusion that a person has a motive to retaliate against another individual for attacking him and for killing his friend is not a matter outside the realm of common experience such that the testimony of an expert is necessary to assist the jury.

Opinion at 38- 40.

However, the Court of Appeal held that the admission of the expert testimony was

harmless error.  Opinion at 40.  The Court of Appeal cited the longstanding violence between the

Surenos and Nortenos and the evidence that petitioner, a Sureno, had a motive to shoot Vasquez,

1  simply for his Norteno affiliation.  Looking at the evidence as a whole, the Court of Appeal

2  concluded that it was not reasonably probable that petitioner would have obtained a favorable

3  jury verdict had the trial court excluded the opinion testimony.  Opinion at 41.

4         This court agrees that Detective Reyes improperly testified about petitioner's

5  personal motive for shooting Vasquez, yet finds that the error was not harmless.  Ordinarily in a

6  review under the AEDPA, the federal court looks through unexplained decisions to the last

7  reasoned decision as the basis for the state court's judgment.  Gill v. Ayers, 342 F.2d 911, 917 n.

8  5 (9th Cir. 2003).  In the instant case, there is no reasoned state court decision addressing

9  petitioner's Confrontation Clause claim.  As such, an independent review of the record is used to

10  decide whether the state court's decision was an objectively unreasonable application of Supreme

11  Court precedent.  Greene v. Lambert, 288 F.3d 1081, 1088 (9th Cir.2002).

12         An unavailable witness's out-of-court statement may be admitted against a

13  criminal defendant and not run afoul of the Confrontation Clause so long as it bears adequate

14  indicia of reliability – i.e., falls within a "firmly rooted hearsay exception" or otherwise bears

15  "particularized guarantees of trustworthiness" such that adversarial testing would be expected to

16  add little, if anything, to the statement's reliability.  Ohio v. Roberts, 448 U.S. 56, 66 (1980);

17  Lilly, 527 U.S. at 124-25.  Whether a statement bears "particularized guarantees of

18  trustworthiness" must be shown from the totality of the circumstances surrounding the making of

19  the statement, not from the trial evidence as a whole.  Idaho v. Wright, 497 U.S. 805, 819 (1990).

20  Petitioner's Confrontation Clause claim is governed by these standards.[8]  The Supreme Court

21

22         [8]  In 2004, the United States Supreme Court held that the Confrontation Clause bars the
   state from introducing into evidence out-of-court statements which are testimonial in nature
23  unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the
   witness, regardless of whether such statements are deemed reliable.  Crawford v. Washington,
24  541 U.S. 36 (2004).  However, for purposes of the AEDPA, this court must look to federal law as
   it existed at the time of the final state court decision on direct review (here October 30, 2002) in
25  determining whether the petition should be granted.  Williams v. Taylor, 529 U.S. 362, 412
   (2000); Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).  The holding in Crawford is not
26  retroactive to cases on collateral review.  Whorton v. Bockting, 549 U.S. 406, 127 S. Ct. 1173,

14

1  held in Lilly, that a non-testifying accomplice's confession to police violated the defendant's

2  right to confrontation even though the confession implicated the accomplice because it did not

3  contain guarantees of trustworthiness.  Lilly, 527 at 139, 119 S. Ct. at 1901.

4           The California Court of Appeal found that the expert had testified to improper

5  hearsay; thus, it stands to reason that the testified-to-hearsay was not firmly rooted in any hearsay

6  exception.  Although experts can sometimes rely on hearsay to form their opinions, the opinion

7  itself was improper in that it was not based on an issue which the jury required expert testimony,

8  and the hearsay itself was critical (as shown below) to an important issue in the case.  Thus, the

9  admission of the hearsay can find no justification in clearly established law.

10          Detective Garcia's testimony about general gang violence and the history between

11  the Surenos and Norenos was proper.  Yet, as stated by the Court of Appeal, Detective Garcia's

12  testimony about petitioner's motive was not expert testimony, simply his opinion procured from

13  just one source, Montanez.  Essentially, Detective Garcia repeated to the jury what Montanez

14  stated in the interrogation.  Montanez' statements were not based on his own observations, rather

15  hearsay statements spoken by the petitioner.  These statements were admitted for the truth of the

16  matter to the jury, in the guise of expert testimony.

17           Montanez was arrested and investigated  in connection with this crime and was

18  identified as the driver of the stolen car involved in the shooting.  While Montanez did not

19  incriminate petitioner as being involved in the shooting, Montanez described a violent history

20  between petitioner and the victim.  Montanez did not incriminate himself in statements to police,

21  he only provided the police with a motive as to why petitioner would shoot Vasquez.  Montanez'

22  statements had no guarantee of trustworthiness and pursuant to Supreme Court authority they

23  were not admissible.  Lilly, 527 at 139, 119 S. Ct. at 1901.

24          Confrontation Clause violations are subject to harmless error analysis.  Delaware

25  ───────────────

26  1184 (2007).  Therefore, the decision in Crawford does not apply because it was decided after
    petitioner's trial and appeal.  Winzer v. Hall, 494 F.3d 1192, 1194 (9th Cir. 2007).

1    v. Van Arsdall, 475 U.S. 673, 680, 106 S. Ct. 1431 (1986).  Thus, this court must now consider

2    whether admission of Detective Garcia's testimony "had substantial and injurious effect or

3    influence in determining the jury's verdict."  Brecht v. Abramson, 507 U.S. 619, 637-38, 113 S.

4    Ct. 1710, (1993).  See also Fry v. Pliler, __U.S.__, 127 S.Ct. 2321, 2328 (2007); Moses v. Payne,

5    543 F.3d 1090, 1100 (9th Cir. 2008) (Confrontation Clause); Jackson v. Brown, 513 F.3d 1057,

6    1084 (9th Cir. 2008) (Confrontation Clause).[9]

7             The Court of Appeal found the above error to be harmless, holding:

8             Although the court erred in admitting the evidence, the error was harmless.
              Garcia testified about the longstanding animosity between the Surenos and
9             Nortenos, which led to the commission of numerous violent attacks between the
              gangs.  He stated it was not uncommon for a Sureno to attack a Norteno stranger
10            simply because of his gang affiliation and that gang members achieve status and
              respect from such attacks.  Garcia also opined, based upon the circumstances of
11            the shootings, that they were gang-related.  Thus, there was ample evidence that
              defendant, who was a Sureno, had a motive to shoot Vasquez simply for being a
12            Norteno.

13   Opinion at 40-41.

14            The Court of Appeal relied on the expert testimony concerning gang violence to

15   hold there was sufficient evidence for the jury to find petitioner had a motive to shoot Vasquez.

16   While this evidence does illustrate a motive for the shooting, it could not, standing alone, have

17   led the jury to find that petitioner committed the shooting with *deliberation* and *premeditation*.

18   The prosecution's only evidence to support attempted premeditated murder were Montanez'

19   statements describing petitioner's motive for revenge.[10]

20   ────────────────

21        [9] A recent case, Slovick v. Yates, __F.3d__, 2008 WL 4459083 (9th Cir. 2008) without
     analyzing the post-AEDPA cases on the subject of harmless error, utilized the Chapman "beyond
22   a reasonable doubt" standard for its Confrontation Clause harmless error analysis.  This case
     clearly is contrary to Supreme Court and Ninth Circuit post-AEDPA and post-Fry case law with
23   respect to the correct harmless error standard.

24        [10] Samuel Vasquez testified at trial as a prosecution witness but was uncooperative.  He
     acknowledged that he was shot but said he did not remember any details of the shooting, he did
25   not remember any of the information he told police and he did not remember anything he said at
     the preliminary hearing.  Vasquez also denied knowing or shooting at petitioner or being
26   assaulted by petitioner.

1        The jury found petitioner guilty on count 4, attempted murder, Cal. Penal Code §

2   664 and § 187(a).[11]  CT at 384.  Attempted murder is not a crime of degrees in California, instead

3   a penalty provision is provided for the jury to increase the sentence if the actions were deliberate

4   and premeditated.  CT at 384.  The trial court instructed the jury that,

5   > "Deliberately" means formed or arrived at or determined upon as a result of
   > careful thought and weighing of considerations for and against the proposed
6   > course of action.

7   > "Premeditated" means considered beforehand.  If you find that the attempted
   > murder was preceded by a clear, deliberate intent to kill which was the result of
8   > deliberation and premeditation so that it must have been formed upon preexisting
   > reflection and not under a sudden heat of passion or other condition precluding the
9   > idea of deliberation, it is attempt to commit willful deliberate and premeditated
   > murder.

10

11  RT at 1315.

12       The jury made a finding that petitioner's commission of the offense was deliberate

13  and premeditated.  CT at 384.  A review of the trial record reveals no other evidence that

14  illustrated petitioner's premeditation.  Without Montanez' statements, a reasonable jury could not

15  find petitioner guilt of attempted premeditated murder.  With respect to the issue of

16  premeditation, the Court of Appeals focused on the wrong issue – the gang inclination for

17  senseless violence as opposed to premeditated violence.  Evidence in the case was rife with

18  illustrations of the senseless motive for gang-on-gang violence.  Make the wrong response to a

19  gang "greeting" or hand signal, and presto – you're an enemy to be blown away.  Clearly this

20  motive to generally respond in violence says nothing about premeditation concerning the specific

21  violent incident, or at absolute best, is equally indicative of an unpremeditated, reflexive scenario

22  as opposed to a premeditated one.  It is classically and senselessly unpremeditated; it arises on

23  the spot.  Here, however, the evidence that a relatively longstanding motive for the crime existed

24  – retaliation for the Toaster killing – bespeaks the state of mind of petitioner to search out the

25  _____

26       [11] Murder is the unlawful killing of a human being with malice aforethought.  RT at 664.

17

victim and kill him, i.e. a premeditated retaliation. The harmless error analysis of the Court of Appeal was unreasonable with respect to the premeditation issue.

The undersigned finds that admission of Detective Garcia's opinion testimony did have a substantial and injurious effect on the verdict as it was the only evidence the jury considered in reaching its decision as to count 4. Petitioner was found guilty of attempted premeditated murder and sentenced to life in prison pursuant to Cal. Penal Code § 664(a), which provides that if an attempted crime is "willful, deliberate, and premeditated murder...the person guilty of that attempt shall be punished by imprisonment in the state prison for life without the possibility of parole." Penal Code section 664(a).

However, the above unreasonableness extends only to the jury finding on premeditation. With respect to attempted murder *per se*, the reasoning of the Court of Appeal is more than reasonable. As set forth previously, even excising the expert's reliance on hearsay, there was plenty of evidence that petitioner attempted to murder the victim. The petition should be granted only as to the jury finding of premeditation.

C. Claim 3 - Denial of Dying Declaration

Petitioner argues that the trial court's exclusion of a dying declaration violated his Fourteenth Amendment right of due process and Sixth Amendment right to present evidence in his own defense. AP at. 35.

*Legal Standard*

A district court may not review collaterally a state court's evidentiary ruling unless it violates federal law, either by violating a specific constitutional provision or by infringing upon the due process right to a fair trial. Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871 (1984). The erroneous exclusion of critical, corroborative defense evidence may violate both the Fifth Amendment due process right to a fair trial and the Sixth Amendment right to present a defense. See Depetris v. Kuykendall, 239 F.3d 1057, 1062 (9th Cir. 2001) (citing Chambers v. Mississippi, 410 U.S. 284, 294, 93 S. Ct. 1038 (1973)).

1          The exclusion of hearsay statements that are critical to the defense and that bear

2    "persuasive assurances of trustworthiness" may rise to the level of a due process violation.  See

3    Chambers, 410 U.S. 284, 302, 93 S. Ct. 1038 (1973); see also Chia v. Cambra, 360 F.3d 997,

4    1003 (9th Cir. 2004).  A court must ensure that the defendant has a full opportunity to defend

5    himself against the state's accusations.  Chambers, 410 U.S. at 294, 93 S. Ct 1045; Chia, 360

6    F.3d at 1003.  That opportunity must not be frustrated by a mechanical application of state

7    evidentiary law.  Chambers, 410 U.S. at 302, 93 S. Ct 1049; Chia, 360 F.3d at 1006.  The state

8    appellate court's decision must be measured against these clearly established principles of federal

9    law.

10          In deciding whether the exclusion of the hearsay statements violates due process

11    under Chambers and its progeny, the Ninth Circuit balances the following five factors: (1) the

12    probative value of the excluded evidence on the central issue; (2) its reliability; (3) whether it is

13    capable of evaluation by the trier of fact; (4) whether it is the sole evidence on the issue or merely

14    cumulative; and (5) whether it constitutes a major part of the attempted defense.  Chia, 360 F.3d

15    at 1004.  The court must also give due weight to the state interests underlying the state

16    evidentiary rules on which the exclusion was based.  Chia, 360 F.3d at 1006.

17          But even if exclusion of the evidence amounts to constitutional error, in order to

18    justify federal habeas relief the erroneous exclusion must have had "a substantial and injurious

19    effect" on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S. Ct. 1710 (1993).

20          As previously mentioned, the prosecution introduced evidence of motive that

21    prior to the shooting of Samuel Vasquez, Vasquez told petitioner he was going to shoot him like

22    he killed Toaster.  RT at 786.  To rebut this evidence, petitioner attempted to admit evidence that

23    Toaster made a dying declaration that a black man shot him.[12]  As Vasquez is not black, but

24    _____

25          [12] Petitioner attempted to admit a police report containing a statement from a police
      officer who was with Toaster after he was shot.  Toaster provided his name and address and said
26    a black man shot him before he lost consciousness.

19

1   Hispanic, petitioner contends that Vasquez could not have shot him and this would prove that

2   petitioner had no motive to shoot Vasquez.  Petitioner contends the evidence was admissible as

3   third party culpability evidence and the courts preclusion of the evidence was not harmless

4   beyond a reasonable doubt.  The Court of Appeal agreed with the trial court's decision in denying

5   the admission of the dying declaration, stating:

6           In any event, despite defendant's assertion to the contrary, the evidence was not
            evidence of third-party culpability because it did not tend to prove that someone

7           other than defendant shot Vaquez.  It is immaterial whether Vasquez shot Toaster.
            The relevant issue is *whether defendant believed that Vasquez killed Toaster,*

8           which gave defendant a motive to shoot Vasquez in retaliation.  Defendant's offer
            of proof did not include any evidence that he was aware of Toaster's dying

9           declaration saying a black man shot him and that, for this reason, defendant did
            not believe Vasquez when he claimed he had shot Toaster.  Accordingly, the court

10          did not abuse its discretion in excluding the evidence pursuant to Evidence Code
            section 352.

11

12  Opinion at 42-43.

13          The Court of Appeal also noted the trial court has discretion to "exclude evidence

14  if its probative value is substantially outweighed by the probability that its admission will (a)

15  necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of

16  confusing the issues, or of misleading the jury."  People v. Minifie (1996) 13 Cal. 4th 1055, 1070.

17  The Court of Appeal held that the trial court did not abuse its discretion.

18          Viewing petitioner's claim under the factors outlined in Chia establishes that the

19  Court of Appeal's decision was not an unreasonable application of Supreme Court precedent.

20  See Chia, 360 F.3d at 1004.  While the dying declaration may have been capable of evaluation by

21  the jury, the statement did not have significant probative value in petitioner's favor.  The dying

22  declaration involved an incident collateral to petitioner's case and was not material to petitioner's

23  defense.  Regardless of who shot Toaster, the important issue is what petitioner knew.  The

24  killing of Toaster was not the sole evidence of petitioner's motive for the shootings.  Petitioner

25  had motive to shoot Vasquez simply due to his gang affiliation.

26  \\\\\

1    The trial court had a significant interest in excluding the dying declaration.  <u>Chia</u>,

2    360 F.3d at 1006.  The trial court could reasonably conclude that the probative value of the

3    evidence was substantially outweighed by the probability that its admission would confuse the

4    issues or mislead the jury.  Cal. Evidence Code section 352.  It cannot be said that the Court of

5    Appeal's decision was an "objectively unreasonable" application of clearly established federal

6    law.  <u>See Willaims (Terry) v. Taylor</u>, 529 U.S. 362, 409, 120 S. Ct. 1495, 1521 (2000).  Thus,

7    there is no merit to this claim.

8    D.  <u>Claim 4</u> - <u>Discovery Sanction</u>

9    Petitioner contends that his right to a fair trial was violated due to a discovery

10   sanction where the trial court instructed the jury that a false fact was true and the Court of

11   Appeals unreasonably applied established United States Supreme Court precedent.  AP at 45.

12   *Legal Standard*

13   The right to present testimony as part of a defense is not without limitation and

14   "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial

15   process." <u>Chambers v. Mississippi</u>, 410 U.S. 284, 295, 93. S. Ct. 1038, 1046 (1973).  In pursuit

16   of the right to present a defense, "the accused, as is required by the State, must comply with

17   established rules of procedure and evidence designed to assure both fairness and reliability in the

18   ascertainment of guilt and innocence." <u>Chambers</u>, 410 U.S. at 302, 93. S. Ct. at 1049.  Trial

19   courts therefore may require that trial witnesses be disclosed before trial and may impose

20   sanctions on defendants (including evidence preclusion) in appropriate circumstances when those

21   requirements are violated.  <u>See</u> <u>Taylor v. Illinois</u>, 484 U.S. 400, 410-16, 108 S. Ct. 646, 653-656

22   (1988) (exclusion of proposed defense witness not timely disclosed); <u>United States v. Nobles</u>,

23   422 U.S. 225, 241, 95 S. Ct. 2160 (1974) (evidence preclusion sanction based on defense failure

24   to comply with pretrial discovery rule to disclose proposed witness' investigative report did not

25   violate Sixth Amendment).

26   \\\\\

1    Habeas relief is usually warranted only if the alleged constitutional errors had a

2 "substantial and injurious effect or influence in determining the jury's verdict." Brecht v.

3 Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 1712 (1993) (quoting Kotteakos v. United

4 States, 328 U.S. at 776 (1946)).  See also Fry v. Pliler, supra ("[t]he opinion in Brecht clearly

5 assumed that the Kotteakos standard would apply in virtually all § 2254 cases").

6    On direct examination by petitioners's counsel, petitioner's girlfriend, Claudia

7 Manriquez, testified that petitioner was at her house on the day of the shootings.  RT at 940-942.

8 Manriquez stated that she, petitioner and a friend, Nora Galviz, left the house at around 5:30 pm

9 to go to the store to pick up a birthday cake and then returned home.  RT at 941.  Petitioner's

10 counsel did not ask Manriquez any details about the trip to the store or petitioner's meeting with

11 Ramiro Montanez in the parking lot.  According to the at Court of Appeal:

12    On cross-examination, the prosecutor asked Claudia a series of questions about
     defendant's whereabouts during the trip.  Claudia revealed that, when they arrived
13    at the store, defendant stopped to talk to Montanez, who was sitting in the driver's
     seat of a large pickup truck in the store's parking lot.  She indicated she and
14    Galaviz entered the store while defendant remained in the parking lot talking to
     Montanez.  When the prosecutor asked her if she saw defendant touch the driver's
15    mirror on the truck, she replied: "He probably could have leaned on it...he
     probably could have touched it."  Claudia asserted she told Stewart, defendant's
16    investigator, about defendant having seen Montanez, but conceded that she did
     not tell him that defendant went over to the truck.
17
     Later in the proceedings, the prosecutor told the court that he wished to call
18    investigator Stewart as a rebuttal witness to ask whether Claudia had told him
     previously about seeing defendant with Montanez.  According to the prosecutor,
19    there was no reference to Montanez or the pickup truck in the discovery materials
     he received regarding Stewart's interview with Claudia on December 13, 1999.
20
     At this point, defense counsel revealed that, during her interview by Stewart on
21    December 22, 1999, Claudia had mentioned defendant's encounter with
     Montanez.
22
     Calling the omission a "huge problem," the court stated it intended to sanction the
23    discovery violation by preventing Stewart from testifying that Claudia had told
     him of the encounter.
24
     At the request of defense counsel, the court held an in camera hearing to learn of
25    counsel's reasons for not turning over Stewart's [complete] report to the
     prosecution.  At the hearing, counsel explained that he did not think he had to
26    disclose to the prosecutor this portion of her statement to Stewart because he

22

never intended to have Claudia testify about her observations of Montanez in the truck. He redacted this information from Stewart's report before giving it to the prosecutor because he believed the evidence was inculpatory in that it showed defendant had a relationship with Montanez.

Following the hearing, the court stated that defense counsel had explained his tactics, and that his decision not to disclose Claudia's statement to Stewart about defendant speaking with Montanez at the grocery store was made in good faith. Nonetheless, the court concluded counsel had violated the reciprocal discovery provisions...by not disclosing the entirety of the statement made by a witness counsel intended to call at trial. In effect, counsel had "sandbagged" the prosecution, which warranted the sanction of precluding Stewart from testifying that Claudia had timely revealed the information about Montanez to him. In addition, the court stated that it would advise the jurors that Claudia did *not* mention Montanez and the pickup truck when Stewart interviewed her. The court reasoned that the sanction in effect allowed the prosecutor to impeach Claudia with a prior inconsistent statement, while not forcing counsel to reveal his theory of the case by disclosing the unredacted contents of Stewart's report.

In accordance with its ruling, the court advised the jurors that they were to consider as conclusively proved the following: "On December 22, 1999, Wilson Stewart interviewed Claudia Manriquez regarding the birthday party and the trip to the store to pick up the cake. She did not tell him of the pickup truck in the parking lot, nor of defendant discussing – talking to the man in the pickup truck."

Opinion at 25-27.

The Court of Appeal held that petitioner's attorney violated his discovery obligations and that sanctions were warranted, but the sanctions imposed by the trial court were excessive. Opinion at 29, 31. The undersigned agrees. The Court of Appeal further stated that the error was harmless beyond a reasonable doubt. Id. at 32. Petitioner argues that the Court of Appeal unreasonably applied Supreme Court precedent when finding that the trial court's error was harmless. AP at 57.

Manriquez' testimony concerning petitioner's interaction with Montanez and the truck was important, but as seen below, not dispositive to the defense. Manriquez provided a plausible reason why petitioner's fingerprints were on the truck, a key piece of evidence linking petitioner to the crimes. The prosecution's fingerprint witness testified that petitioner's fingerprints were on driver's side mirror and the driver's side door. RT at 452-453. The trial court's sanction, by undermining Manriquez' credibility, hampered petitioner's defense. The

23

1    undersigned will assume, for the purpose of argument, that petitioner's right to put on a defense

2    was violated by the excessive sanctions of the trial court.

3           However, even if the sanctions were excessive, as noted by the Court of Appeal,

4    the trial court's sanction was harmless error and the undersigned finds that it did not have a,

5    "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S.

6    at 637, 113 S. Ct. at 1712.  Petitioner presented other alibi witnesses, including Nora Galaviz

7    who testified about petitioner's meeting with Montanez in the store parking lot.  RT at 970-971.

8    While Manriquez' credibility was hurt by the sanctions she had already been impeached by her

9    employment records.  The employment records showed that Manriquez worked approximately

10   five hours on the day of the shootings which meant she could not have been with petitioner all

11   day as she stated.  RT at 947-949.  It was demonstrated that Galaviz and the other alibi witnesses

12   were either friends or relatives of Manriquez which undermined their credibility.

13          Petitioner testified in his own defense and attempted to explain why his

14   fingerprints were on the car, even though he claimed to never have been inside it .  RT 1019-

15   1020.  However, petitioner's testimony was not credible when he attempted to explain why his

16   fingerprints were on the mirror portion of the driver's side mirror.  The prosecution alleged that

17   petitioner was inside the drivers side of the car and adjusted the mirror. RT at 1019.  Petitioner

18   stated that he could have walked up to the driver's side of the car and then leaned on the car, his

19   hand upside down against the mirror while he spoke with Montanez.  Id.  Petitioner's explanation

20   has little persuasive value.

21          It should also be noted that the disputed testimony can be seen to incriminate

22   petitioner as it puts him with Montanez and the car, the primary reason petitioner's attorney

23   redacted the information.  Any error by the trial court was harmless and petitioner has failed to

24   show any violation that would necessitate habeas relief under Brecht.

25   \\\\\

26   \\\\\

24

1      E.  Claim 5 - Ineffective Assistance of Counsel.

2          Petitioner argues that if defense counsel's conduct in redacting the investigator's

3  report was improper and resulted in the trial court's sanction, then petitioner received ineffective

4  assistance of counsel.  AP at 59.

5          This claim was denied without a reasoned opinion by any state court.  If a state

6  court denies constitutional claims without a reasoned decision, a federal court reviewing a habeas

7  corpus application pursuant to § 2254(a) "ha[s] no basis other than the record for knowing

8  whether the state court correctly identified the governing legal principle or was extending the

9  principle into a new context."  Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000).  "While

10  Supreme Court precedent is the only authority that is controlling under AEDPA, we look to

11  Ninth Circuit case law as 'persuasive authority for purposes of determining whether a particular

12  state court decision is an "unreasonable application" of Supreme Court law.' "  Luna v. Cambra,

13  306 F.3d 954, 960 (9th Cir.2002).  Thus, pursuant to Delgado, the Court must conduct an

14  independent review of the record to determine whether the state court's decision was objectively

15  unreasonable.  In Delgado, the Ninth Circuit held that, "Federal habeas review is not de novo

16  when the state court does not supply reasoning for its decision, but an independent review of the

17  record is required to determine whether the state court clearly erred in its application of

18  controlling federal law."  223 F.3d at 982; see also Luna, 306 F.3d at 954 (quoting Fisher v. Roe,

19  263 F.3d 906, 915 (9th Cir. 2001) (internal citation omitted) ("We reverse only if 'a careful

20  review of the record and the applicable case law leaves us with the "firm conviction" that the

21  state court was wrong.' ")).

22          The test for demonstrating ineffective assistance of counsel is set forth in

23  Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

24  that, considering all the circumstances, counsel's performance fell below an objective standard of

25  reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, petitioner must

26  identify the acts or omissions that are alleged not to have been the result of reasonable

1  professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

2  whether in light of all the circumstances, the identified acts or omissions were outside the wide

3  range of professional competent assistance.  Id.  "We strongly presume that counsel's conduct

4  was within the wide range of reasonable assistance, and that he exercised

5  acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

6  695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

7          Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

8  693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

9  counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

10  694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

11  confidence in the outcome."  Id.

12          If petitioner fails to show the challenged action by counsel was prejudicial in that

13  it affected the reliability of the trial process, the claim of ineffective assistance of counsel may be

14  rejected without deciding if counsel's conduct was deficient.  Strickland, 466 U.S. at 697, at 104

15  S. Ct at 2069.  As previously stated, an independent review of the record shows that the

16  petitioner was not prejudiced by the trial court's sanction.

17          F.  Claim 6 - Brady Violation

18          Petitioner also contends that his right to a fair trial was violated by the

19  prosecution's failure to disclose information of other potential suspects from the California gangs

20  (CAL-GANGS) database.  AP at 66.

21          *Legal Standard*

22          The Due Process Clause of the Fourteenth Amendment requires the State to

23  disclose to criminal defendants favorable evidence that is material either to guilt or to

24  punishment.  United States v. Agurs, 427 U.S. 97, 96 S. Ct. 2392 (1976); Brady v. Maryland, 373

25  U.S. 83, 83 S. Ct. 1194 (1963).  A so-called "Brady" claim contains three essential elements or

26  components: "The evidence at issue must be favorable to the accused, either because it is

1   exculpatory, or because it is impeaching; that evidence must have been suppressed by the State,

2   either willfully or inadvertently; and prejudice must have ensued." Banks v. Dretke, 540 U.S.

3   668, 691, 124 S. Ct. 1256, 1272 (2004) (quoting Strickler v. Greene, 527 U.S. 263, 281-282, 119

4   S. Ct. 1936, 1948 (1999)).

5           The prosecution violates the constitutional duty of disclosure if his omission is

6   sufficiently significant to result in the denial of the defendant's right to a fair trial. Agurs, 427

7   U.S. at 106-107, 96 S. Ct. at 2399.  The duty exists regardless of whether a specific request has

8   been made by the defense, or whether the suppression was intentional or inadvertent. Id. at 110,

9   96 S. Ct. at 2400.

10          Evidence is material "only if there is a reasonable probability that, had the

11  evidence been disclosed to the defense, the result of the proceeding would have been different."

12  United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).  A "reasonable

13  probability" is a probability sufficient to undermine confidence in the outcome. Id., S. Ct. At

14  3383.  A mere reasonable possibility is insufficient to establish prejudice. Strickler, 527 U.S. at

15  291, 119 S. Ct. at 1953.

16           If the prosecution is uncertain about the materiality of information within its

17  possession, it may submit the information to the trial court for an In Camera inspection and

18  evaluation. Agurs, 427 U.S. at 106, 96 S. Ct. at 2399.

19          The Court of Appeal noted the following facts:

20      On October 15, 1999, officers interviewed Ramiro Montanez, who had been seen
        driving the pickup truck involved in the Vasquez shooting approximately one or

21      two hours before the incident.  Montanez stated that he observed an individual
        known to him as "Killer" or "Matone" near the pickup truck in the location where

22      it was found abandoned after the shooting.  Montanez knew Matone's first name
        as "Velasquez" and he was 26 years of age.  Montanez also said that Matone was

23      from Long Beach and had not been in Stockton very long.  He had a "VST" tattoo
        on his neck, another one inside his mouth, a "1" tattooed under one eye, and a "3"

24      under the other.

25      In March 2000, defense counsel informally requested discovery of information
        counsel believed would lead to Matone's identity.  The prosecution provided

26      counsel with a memorandum summarizing information from a law-enforcement

27

computer program referred to as "CAL-GANGS," concerning 16 gang members whose characteristics most closely matched those of Matone. But none of the 16 had all of the characteristics described by Montanez.

Defendant moved to compel the prosecution to provide him with photographs and fingerprints of the 16 gang members. Initially, the court ordered the prosecution to provide a photograph and fingerprints of one person on the list, as well as the names of the other gang members and pertinent law enforcement agencies for defense counsel to contact. However, the prosecutor moved for reconsideration of the court's order on the ground that direct discovery of the CAL-GANGS information was inappropriate because it violated an agreement between the database provider and the Stockton Police Department. Following an in camera hearing, the court stayed the order.

At the in camera hearing, an administrator of the CAL-GANGS database told the court CAL-GANGS is a confidential intelligence system that is required to be shielded from public access. This is so since releasing the names of those in the database could make it harder for police to track gang activities because, once gang members learn of the confidential system and discover they are in it, they probably would change their identifying characteristics. Furthermore, disclosure of the information to a gang member's attorney could lead to violence if the information was about a rival gang and was leaked to the accused.

The administrator stated that his search revealed there were only 12 gang members who had "VST" tattoos on their necks and, of those, only 6 belonged to the Vickystown gang. None of those six had a first, middle, or last name of Velasquez. Four were between the ages of 21 and 30, but none of the four had a nickname of "Killer" or "Matone," or were from Stockton. No one had a tattoo inside his mouth. Of the Vickystown gang members between the ages of 21 and 30 with a "VST" tattoo, one was from Long Beach and had three dots under his eye. However, he was 24 years old and had a moniker of "Criminal."

The court ruled that defense counsel was not entitled to the information "as a statutory matter" and, as for defendant's constitutional claim, the information was not material in part due to the many dissimilarities between the person described by Montanez and those referenced in the CAL-GANGS database. Defendant renewed his motion for discovery after the original complaint was dismissed and the case was refiled, but the court denied the motion again.

Opinion at 19-21.

Petitioner maintains that if he had access to the CAL-GANGS database, he may have been able to discover the identity of Matone, who may have had access to the truck and this information may have provided reasonable doubt. The Court of Appeal rejected petitioner's argument stating:

Defendant's arguments "are speculative and fail to point out, as required by Bagley, how production of these materials would have created a reasonable

28

1    probability of a different result." (Downs v. Hoyt (9th Cir.2000) 232 F.3d 1031,
2    1037.)  Given the speculative value of the requested evidence, and the
     government's legitimate interest in protecting confidential information in the
3    CAL-GANGS system, the trial court did not abuse its discretion in denying
     defendant's request for discovery. ( People v. Superior Court (Barrett), supra, 80
4    Cal.App. 4th at p. 1316, 96 Cal.Rptr.2d 264 [trial court has broad discretion to
     protect against the disclosure of information that might violate a legitimate
5    governmental interest].)

6    Opinion at 24.

7          In this case, the prosecution properly submitted to the trial court for In Camera

8    evaluation the information from the CAL-GANGS database.  The trial court was in the best

9    position to decide if the information in CAL-GANGS should be disclosed to petitioner.  See

10   United States v. Gardner, 611 F.2d 770, 774 (9th Cir. 1980).  The CAL-GANGS administrator

11   stated several legitimate reasons why the information in the database needed to remain

12   confidential yet still provided the trial court with the CAL-GANGS information relevant to

13   petitioner's case.

14         Petitioner's argument relies on a great deal of speculation that fails to rise to a due

15   process violation.  Petitioner has not shown that the evidence would even have been favorable to

16   his defense much less that prejudice ensued.  Banks, 540 U.S. 668, 124 S. Ct. 1256.  Assuming

17   that petitioner could prove that this other gang member, Matone, was in the truck, it does not aid

18   in petitioner's defense.  Petitioner was identified by several witnesses as the shooter and his

19   fingerprints were in the truck.  Showing that Matone was also in the truck would open the

20   possibility of another accomplice but does not exonerate petitioner.   Accordingly, the state

21   court's determination of this issue was not contrary to, or an unreasonable application of, clearly

22   established Supreme Court precedent.

23         G.  Claim 7 - Juror Replaced Without Instruction

24         Petitioner contends that his right to due process was violated when an alternate

25   juror was substituted during deliberations and the trial court failed to instruct the jury to begin its

26   deliberations anew.  Petitioner's State Appellate Brief at 57.

1          *Legal Standard*

2          A challenge to jury instructions does not generally state a federal constitutional

3 claim.  See Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983); see also Middleton v.

4 Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  Habeas corpus is unavailable for alleged error in the

5 interpretation or application of state law.  Estelle v. McGuire, 502 U.S. 62, 112 S. Ct. 475

6 (1981); see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

7 F.2d 1378, 1381 (9th Cir. 1986).  The standard of review for a federal habeas court "is limited to

8 deciding whether a conviction violated the Constitution, laws, or treaties of the United States

9 (citations omitted)."  Estelle v. McGuire, 502 U.S. at 68, 112 S. Ct. at 480.  In order for error in

10 the state trial proceedings to reach the level of a due process violation, the error had to be one

11 involving "fundamental fairness."  Id. at 73, 112 S. Ct. at 482.  The Supreme Court has defined

12 the category of infractions that violate fundamental fairness very narrowly.  Id. at 73, 112 S. Ct.

13 at 482.

14          Shortly after the jury retired for deliberations it requested a read back of certain

15 testimony but when the jury assembled in the courtroom one of the jurors was excused for child

16 care reasons.  RT at 1333-1337, 1348-1349.  Before excusing the juror, the trial court advised the

17 jury: "If I have to substitute somebody in, I will instruct you that you must discard any tentative

18 conclusions you have reached and start over again from square one."  RT at 1348.  The trial court

19 stated to the jury again: "I will be telling you to disregard any tentative conclusions you've made

20 but perhaps there's some things that you can work on and at least be thinking about until we can

21 seat the alternate."  RT at 1349.  However, when the alternate juror was seated, the trial court

22 neglected to tell the jury to disregard their previous conclusions and begin anew.[13]  RT at 1352.

23

24          [13] California Penal Code § 1089 states in part: " If at any time, whether before or after the
final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause

25 shown to the court is found to be unable to perform his or her duty, or if a juror requests a
discharge and good cause appears therefor, the court may order the juror to be discharged and

26 draw the name of an alternate, who shall then take a place in the jury box, and be subject to the

Petitioner argues that he did not receive his constitutionally guaranteed right to a trial with all twelve jurors engaged in all of the jury's deliberations.  Petitioner relies largely on California cases that discuss the replacement of jurors, but the Court of Appeals rejected this argument:

> As we have noted, 11 of the jurors were told they would need to disregard their prior conclusions and begin their deliberations anew when the 12th juror was replaced with the alternate juror.  Not privy to this advisement, the alternate juror was instructed with the rest of the jurors as follows: "The People and defendant are entitled to the individual opinion of each juror.  Each of you must consider the evidence for the purpose of reaching a verdict if you can do so.  Each of you must decide the case for yourself, but should do so only after discussing the evidence and instructions with the other jurors.  Do not hesitate to change an opinion if you are convinced it is wrong.  However, do not decide any question in a particular way because a majority of the jurors or any of them favor that decision." (See CALJIC No. 17.40.)  Under the circumstances, reasonable jurors would have interpreted this instruction to compel them to commence deliberation anew when the alternate was seated.
>
> The record reflects that the jurors deliberated for no more than six hours before they began deliberations with the alternate juror, and that none of the testimony was read back until the alternate was seated.  Thereafter, the jury spent approximately 11 hours reviewing testimony and deliberating before it reached its verdict.  In other words, after the alternate was seated, the jury spent almost twice as much time together than before the substitution.  This implies that the jury did begin its deliberations anew when the alternate was seated.

Opinion at 45-46.

The Ninth Circuit has held that Cal. Penal Code § 1089 does not violate constitutional rights and the statue "preserve[s] the 'essential feature' of the jury required by the Sixth and Fourteenth Amendments."  Miller v. Stagner, 757 F. 2d 988, 995 (9th Cir. 1985).  Failure to give an instruction which might be proper as a matter of state law does not amount to a federal constitutional violation.  Id. at 993.  However, petitioner has cited no case nor has this court found Supreme Court authority requiring that a specific instruction be given to the jury after an alternate has been substituted for a deliberating juror.  In Claudio v. Snyder, 68 F. 3d

same rules and regulations as though the alternate juror had been selected as one of the original jurors."

1573, 1577 (3rd Cir. 1995), the Third Circuit suggested that such an instruction is not

constitutionally compelled.  See also Peek v. Kemp, 784 F.2d 1479, 1484-85 (11th Cir. 1986);

U.S. v. Evans, 635, F. 2d 1124, 1128 (4th Cir. 1980).

The Court of Appeal considered if the trial court's failure to give such an

instruction prejudiced the petitioner and found it to be harmless error as, "it is not reasonably

probable that defendant would have obtained a more favorable result if the court had given the

required instruction."  Opinion at 47.  The record shows that the trial court gave the proper

instruction several times during the course of the trial and the jury deliberated nearly twice as

long after the new juror was added.  In light of Miller and the lack of Supreme Court authority on

the issue, the Court of Appeal's ruling is not an unreasonable application of federal law.

H.  Claim 8 -  Prosecutorial Misconduct

Petitioner maintains that he was deprived of a fair trial when in closing arguments

the prosecution made a reference to petitioner's previous criminal activity in violation of the trial

court's ruling that precluded such references.  AP at 72-73.

*Legal Standard*

Success on a claim of prosecutorial misconduct requires a showing that the

conduct infected the trial with unfairness so as to make the resulting conviction a denial of due

process.  Greer v. Miller, 483 U.S. 756, 765, 107 S. Ct. 3102, 3109 (1987) (quoting Donnelly v.

DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871 (1974)).  The conduct must be examined

to determine "whether, considered in the context of the entire trial, that conduct appears likely to

have affected the jury's discharge of its duty to judge the evidence fairly."  United States v.

Simtob, 901 F.2d 799, 806 (9th Cir. 1990).

The appropriate standard of review for a claim of prosecutorial misconduct on a

writ of habeas corpus is "the narrow one of due process, and not the broad exercise of

supervisory power."  Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471 (1986)

(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 642, 94 S. Ct. 1868, 1871 (1974)).

1   According to the Supreme Court, "the touchstone of due process analysis in cases of alleged

2   prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith

3   v. Phillips, 455 U.S. 209, 219, 102 S. Ct. 940, 947 (1982).  Thus, the federal habeas court must

4   distinguish between "ordinary trial error of a prosecutor and that sort of egregious

5   misconduct . . . amount[ing] to a denial of constitutional due process." Id., 102 S. Ct. at 947.

6   Improper prosecutorial argument violates rights under the federal constitution if it "so infected

7   the trial with unfairness as to make the resulting conviction a denial of due process." Darden v.

8   Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting Donnelly v.

9   DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L.Ed.2d 431 (1974)).  It "is not enough that

10  the prosecutor[']s[] remarks were undesirable or even universally condemned." Id. (internal

11  quotation marks omitted).  Allen v. Woodford, 395 F.3d 979, 997-998 (9th Cir. 2004).

12          Petitioner contends that his due process rights were violated during closing

13  arguments when the prosecution referred to petitioner's criminal activity in violation of the state

14  trial court's ruling precluding the prosecution from presenting such evidence.  Petitioner

15  maintains this was reversible error.  The statement by the prosecutor at issue comes in the context

16  of defense counsel's closing arguments.  Petitioner's counsel suggested that simply because there

17  was evidence petitioner associated with gang members did not mean that petitioner was involved

18  in criminal activity.  RT at 1231.  The prosecution objected and asked to approach the bench.  RT

19  at 1231.  The trial court overruled the objection and denied the request to approach the bench.  Id.

20  The trial court told the prosecutor that he would "have a chance to respond." Id.  The specific

21  statement at issue occurred when the prosecutor responded, "I can't, [be]cause you've kept it

22  out." Id.  The prosecutor made this statement in the presence of the jury and the trial court

23  instructed the jury to ignore the comment.  RT at 1232.  The jury left the court room at which

24  time the trial court admonished the prosecutor for his misconduct. Id.

25          Petitioner argues that the prosecutor's remark suggested to the jury that the

26  petitioner was involved in past criminal activity but the prosecutor was prevented from

33

1  presenting this evidence.  AP at 75.  Petitioner believes that the implied suggestion that the

2  petitioner was involved in criminal activity influenced the jury's verdict and was a deprivation of

3  due process.

4        Petitioner's claim has no merit.  The prosecutor made a single comment.  The

5  prosecutor did not refer to any specific incident or criminal activity, rather he stated that he could

6  not properly respond to defense counsel's closing argument.  There was no indication that the

7  jury understood what the statement referred to and the trial court immediately instructed the jury

8  to disregard the comment.  The prosecutor's isolated misstatement did not deprive petitioner of a

9  fair trial.  See Duckett v. Godine, 67 F.3d 734, 742 (9th Cir. 1995) (petitioner not entitled to

10  habeas relief based on a single improper comment by prosecutor).

11        Regardless of the prosecutor's statement, the prosecution was permitted to

12  introduce evidence of petitioner's gang involvement.  Police officers testified at trial that

13  petitioner had acknowledged his gang affiliation and another officer testified petitioner was

14  present when an associate of the petitioner shot a rival gang member in 1996 and petitioner was

15  later found in possession of the firearm.  RT at 575.  There was strong evidence that the two

16  shootings of the instant case were gang related and petitioner had gang tattoos.  Looking in the

17  context of the entire trial, the prosecutor's comment was not the only mention of gang or criminal

18  activity.  With all this evidence a reasonable juror would clearly realize there was a gang

19  component to this crime and petitioner was involved in gang activity to some extent.

20        Any error resulting from the prosecutor's statement was harmless and not so

21  egregious to cause a denial of constitutional due process.  Smith, 455 U.S. at  219, 102 S. Ct. at

22  947.   The one statement by the prosecutor did not have such an effect and therefore, this claim

23  should be denied.

24        I. Claim 9 - Jury Instructions

25        Petitioner contends that the trial court gave improper jury instructions and should

26  have instructed the jury that it could find petitioner guilty of a lesser degree of attempted

1    unpremeditated murder.  AP at 61.

2        *Legal Standard*

3        A challenge to a jury instruction solely as an error under state law does not state a

4    claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S. 62,

5    71-72, 112 S. Ct. 475, 481- 482 (1991).  Nor does the fact that a jury instruction was inadequate

6    by Ninth Circuit direct appeal standards mean that a petitioner who relies on such an inadequacy

7    will be entitled to habeas corpus relief from a state court conviction.  See Duckett v. Godinez, 67

8    F.3d 734, 744 (9th Cir.1995) (citing Estelle, 502 U.S. at 71-72, 112 S.Ct at 482).

9        To obtain federal collateral relief for errors in the jury charge, a petitioner must

10   show that the ailing instruction by itself so infected the entire trial that the resulting conviction

11   violates due process. See Estelle, 502 U.S. at 72, 112 S. Ct. At 482; Cupp v. Naughten, 414 U.S.

12   141, 147, 94 S. Ct. 396, 400 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94

13   S. Ct. 1868, 1871 (1974) (" '[I]t must be established not merely that the instruction is

14   undesirable, erroneous or even "universally condemned," but that it violated some [constitutional

15   right].' ").

16       Petitioner was charged with the attempted premeditated murder of Samuel

17   Vasquez pursuant to California Penal Code section 664(a).[14]  CT at 25.  The trial court instructed

18   the jury with California Jury Instructions - Criminal (CALJIC) No. 8.66 on the elements of

19   attempted murder.[15]  RT at 1314.  The trial court also used CALJIC No. 8.67 to instruct the jury

20

21

_____

22       [14] The section provides that if an attempted crime is "willful, deliberate, and premeditated
     murder...the person guilty of that attempt shall be punished by imprisonment in the state prison
23   for life without the possibility of parole."  Penal Code section 664(a).

24       [15] The jury was instructed: "In order to prove attempted murder, each of the following
     elements must be proved: Number one, a direct but ineffectual act was done by one person
25   towards killing another human being; And, number two, the person committing the act harbored
     express malice aforethought, namely a specific intent to kill unlawfully another human being."
26   RT at 1314.

1   to find if the crime was willful, deliberate and premeditated.[16]  The jury was also instructed on

2   the lesser offense of attempted voluntary manslaughter.  RT at 1319-1323.  The jury found

3   petitioner guilty of attempted murder and made a finding that the offense was deliberate and

4   premeditated.

5           Petitioner argues that the jury should have been instructed with a modified version

6   of CALJIC No. 8.71 to address attempted murder.[17]  However, the crime of attempted murder is

7   not divided by degrees in California.  Instead Penal Code section 664(a) uses a penalty provision

8   when the jury finds special circumstances have been met.  Petitioner argues that attempted

9   murder should be divided in degrees and the failure to do so is in violation of established federal

10  law, namely Apprendi v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000).  The Supreme Court

11  held in Apprendi that, "Other than the fact of a prior conviction, any fact that increases the

12  penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and

13  proved beyond a reasonable doubt."  Apprendi, 530 U.S. 466 at 490, 120 S. Ct. at 2362-2363.

14          The Court of Appeal held that there was no error in failing to instruct the jury as

15  petitioner claimed was required, as the issuing of CALJIC 8.66 and 8.67 adequately eliminated

16  any prejudice to petitioner.  Opinion at 48.  The Court of Appeal stated that the jury instructions

17  were compatible with Apprendi:

18  _____

19          [16] The jury was instructed: "If you find that the attempted murder was preceded and
    accompanied by a clear, deliberate intent to kill which was the result of deliberation and

20  premeditation so that it must have been formed upon preexisting reflection and not under a
    sudden heat of passion or other condition precluding the idea of deliberation, it is attempt to
    commit willful, deliberate and premeditated murder... [¶] To constitute willful, deliberate and

21  premeditated attempted murder, the would-be slayer must weigh and consider the question of

22  killing and the reasons for and against such a choice, and having in mind the consequences,
    decides to kill and makes a direct but ineffectual act to kill another human being...[¶] You will
    include a special finding on that question in your verdict using a form that will be supplied fro

23  that purpose." RT at 1315-1316.

24          [17] Petitioner wants to create a jury charge that instructs, "If you are convinced beyond a
    reasonable doubt and unanimously agree that the crime of attempted murder has been committed

25  by a defendant, but you unanimously agree that you have a reasonable doubt whether the
    attempted murder was of the first or of the second degree, you must give defendant the benefit of

26  that doubt and return a verdict fixing the murder as of the second degree."

> Consequently, the instructions advised the jurors that they first had to determine whether defendant committed attempted murder. Only if they found defendant guilty of attempted murder did the jurors have to decide whether that attempted murder was premeditated. And if they were unable to find beyond a reasonable doubt that the crime was premeditated, the jurors were directed to find the premeditation allegation untrue.

Opinion at 49.

With respect to petitioner's argument that California Penal Code section 664(a) should be separated into degrees, it is well-established that it is left to state legislatures and courts, rather than the federal courts, to define the scope and nature of state law crimes. See Patterson v. New York, 432 U.S. 197, 201-02, 97 S. Ct. 2319, 2322 (1977) ("It goes without saying that preventing and dealing with crime is much more the business of the States than it is of the Federal Government [ cit. om.], and that we should not construe the Constitution so as to intrude upon the administration of justice by the individual States"); Martin v. Ohio, 480 U.S. 228, 232, 107 S. Ct. 1098, 1101(1987) (citing Patterson and reiterating "the reluctance of the Court to disturb a State's decision with respect to the definition of criminal conduct"). Hence, "it is the sole responsibility of the States to define the elements of their criminal offenses." Jeffries v. Blodgett, 5 F.3d 1180, 1194 (9th Cir.1993) ( citing Martin, supra ). The Court of Appeal ruled there was no error in the jury instructions under state law and petitioner has failed to show that the jury instruction was so egregious as to violate due process or be in violation of federal law.

Petitioner argues that the jury should have had the opportunity to decide between varying degrees of attempted premeditated murder. California law already allows for this with CALJIC No. 8.67, which gives the jury the option of finding that attempted murder was premeditated or not. Petitioner does not state how his proposed jury instruction is any different then current California law. Consequently, the state court's determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

\\\\\

\\\\\

1    J.  Claim 10 - Sentencing Errors

2    Finally, petitioner contends that the imposition of consecutive sentences based

3    upon factual findings made by the trial court by a preponderance of the evidence violates

4    Apprendi and Blakely.  AP at 80-81.

5    *Legal Standard*

6    This claim was denied without a reasoned opinion by any state court, so pursuant

7    to Delgado, this Court must conduct an independent review of the record to determine whether

8    the state court's decision was objectively unreasonable.  Delgado v. Lewis, 223 F.3d 976, 981-82

9    (9th Cir. 2000).  In Apprendi, 530 U.S. at 490, 120 S. Ct. at 2362-2363,  the Supreme Court held

10   that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime

11   beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a

12   reasonable doubt."  In Blakely v. Washington, 542 U.S. 296, 303-304, 124 S. Ct 2531, 2537

13   (2004),  the Supreme Court held that "the 'statutory maximum' for Apprendi purposes is the

14   maximum sentence a judge may impose solely on the basis of the facts reflected in the jury

15   verdict or admitted by the defendant.

16   In Cunningham v. California, 549 U.S. 270, 127 S. Ct. 856, 868 (2007), the

17   Supreme Court struck down California's sentencing plan on the basis that it violated Apprendi's

18   "bright-line rule," i.e., that "[e]xcept for a prior conviction, 'any fact that increases the penalty

19   beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a

20   reasonable doubt.' "  The Supreme Court found that the middle term described in the California

21   statutes constituted the relevant statutory maximum, and that because aggravating circumstances

22   were found by a judge and not a jury, and need only be established by a preponderance of the

23   evidence, the sentencing scheme violated Apprendi.  Cunningham, 549 U.S. 270, 127 S. Ct. at

24   873.  In 2005, the Ninth Circuit held in Schardt v. Payne, 414 F.3d 1025 (9th Cir. 2005), that

25   Blakely, "does not apply retroactively to a conviction that was final before that decision was

26   announced."  Schardt, 414 F.3d at 1038.

1     Petitioner's claim arises out of the determinate sentences set by the trial court.

2   The trial court sentenced petitioner to 13 years and four months that was imposed consecutively

3   to a 10 year determinate term and an indeterminate life term with the possibility of parole.[18]  AP

4   at 80.  The trial court imposed consecutive terms after finding that the shootings were separate

5   incidents in time and place from each other, the victims were particularly vulnerable and

6   petitioner felt no threat from three of the victims.[19]  RT at 1431.  Petitioner argues that the

7   imposition of the consecutive sentences were based on the trial court's findings and not by a jury

8   beyond a reasonable doubt.  AP at 80.

9     Petitioner was sentenced on January 29, 2001 and the Court of Appeal affirmed

10  petitioner's conviction on August 20, 2002.  Petitioner's conviction and sentence became final on

11  January 28, 2003, ninety days after the California Supreme Court denied petitioner's petition for

12  review on October 30, 2002.  Beard v. Banks, 542 U.S. 406, 411, 124 S. Ct. 2504, 2510 (2004)

13  ("State convictions are final for purposes of retroactivity analysis when the availability of direct

14  appeal to the state courts has been exhausted and the time for filing a petition for a writ of

15  certiorari has elapsed or a timely filed petition has been finally denied.").

16    The Supreme Court decided Blakely on June 24, 2004, nearly a year and a half

17  after petitioner's case become final and pursuant to Schardt, Blakely cannot be applied

18  retroactively.  The Ninth Circuit also held that Cunningham did not announce a new rule of

19  constitutional law.  Butler v. Curry, 528 F.3d 624, 639 (9th Cir. 2008).  Instead, Cunnigham

20  applied Blakely to the specific California sentencing plan.  Id.  Thus, Blakely cannot be applied

21  to petitioner's case.

22  _____

23    [18] The Response from the Attorney General calculated the determinate sentence to equal
    12 years and eight months.  Attorney General's Response at 63.

24

25    [19] California sentencing rules allow consecutive sentences if the crimes are committed at
    different times or different places rather than just one single period of criminal behavior.  Cal.
    Rules of Court 4.425(a)(3).  In addition, any other circumstance in aggravation or mitigation can

26  be used to decide to impose consecutive terms.  Id.

1        Furthermore, the Supreme Court's decisions in <u>Apprendi</u>, <u>Blakely</u>, and

2   <u>Cunningham</u> did not indicate that the Supreme Court's holdings would even apply to a state

3   judge's authority to impose consecutive sentences.[20]  Whether or not <u>Blakely</u> applies to a state's

4   consecutive sentencing scheme is an unresolved question.  <u>See</u>, <u>e.g.</u>, <u>State v. Ice,</u> 343 Or. 248

5   (2007) (holding it does apply); <u>State v. Kahapea</u>, 111 Hawai'i 267, 278-80 (2006) (holding it

6   does not).  In addition, several circuits have held that a judge may impose consecutive sentences

7   based on facts not found by the jury.  <u>See</u> <u>United States v. Hicks</u>, 389 F.3d 514, 531-32 (5th

8   Cir.2004); <u>United States v. Pressley</u>, 345 F.3d 1205, 1213 (11th Cir.2003); <u>United States v. Lott</u>,

9   310 F. 3d 1231, 1242-43 (10th Cir. 2002);  <u>United States v. Hollingsworth</u>, 298 F.3d 700, 702

10  (8th Cir.2002); <u>United States v. Noble</u>, 299 F.3d 907, 909-10 (7th Cir.2002); <u>United States v.</u>

11  <u>White</u>, 240 F.3d 127, 135 (2d Cir.2001).  In sum, there is no established Supreme Court authority

12  on the subject of <u>Blakely's</u> et al, application to consecutive sentences under state law.

13       It is true that in <u>United States v. Fifield</u>, 432 F.3d 1056 (9th Cir.2005), the Ninth

14  Circuit considered a <u>Blakely</u> challenge to consecutive sentencing under the federal guidelines.

15  The Ninth Circuit denied the claim but did not hold <u>Blakely</u> inapplicable in that context.  The

16  <u>Fifield</u> court considered how the federal sentencing guidelines actually functioned.  "Because ... a

17  district court need not find any particular fact to impose consecutive sentences," the court

18  concluded, "the imposition of consecutive sentences does not violate the Sixth Amendment."  <u>Id</u>.

19  at 1067.  However, this federal guidelines case does not mandate a conclusion that state

20  sentencing schemes which permit a judge to impose consecutive sentences for multiple charges is

21  violative of <u>Apprendi</u> et al.  <u>Apprendi's</u> focus is on the maximum penalty for a given charge –

22  singular.  The Supreme Court has never held that in determining the cumulative penalty for

23

24       [20]  On March 17, 2008, the Supreme Court granted a petition for a certiorari to address the
     question, "Whether the Sixth Amendment, as construed in <u>Apprendi v. New Jersey</u>, 530 U.S.
25   466, 120 S. Ct. 2348 (2000), and <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531 (2004),
     requires that facts (other than prior convictions) necessary to imposing consecutive sentences be
26   found by the jury or admitted by the defendant."  <u>See</u> <u>Oregon v. Ice</u>, --- U.S. ----, 128 S. Ct. 1657
     (2008).  A ruling is still pending, but oral arguments were heard on October 14, 2008.

1  separate charges involving separate incidents, which could theoretically be brought separately,

2  one has a Sixth Amendment right to concurrent sentencing absent the jury finding the basis for

3  consecutive sentencing.  Such a rule would amount to making ministerial the duties of a judge at

4  sentencing, and takes Apprendi beyond its logical basis.

5          Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

6  a writ of habeas corpus be granted in part on the Confrontation Clause issue.  The case should be

7  sent back to state court for resentencing only on attempted murder without a finding of

8  premeditation.

9          These findings and recommendations are submitted to the United States District

10 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

11 days after being served with these findings and recommendations, any party may file written

12 objections with the court and serve a copy on all parties.  Such a document should be captioned

13 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

14 shall be served and filed within ten days after service of the objections.  The parties are advised

15 that failure to file objections within the specified time may waive the right to appeal the District

16 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

17 Dated: November 20, 2008

18                            /s/ Gregory G. Hollows
                             UNITED STATES MAGISTRATE JUDGE
19
   ggh:8
20 her280

21

22

23

24

25

26

41